**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 12-cv-01759-RM-CBS

HEIDI BECK, an individual; and
LISA FRANCIS, an individual;

      Plaintiffs,

v.

INTEGRA TELECOM HOLDINGS, INC., an Oregon Corporation

      Defendant

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs Heidi Beck and Lisa Francis ("Beck" or "Francis" or together "Plaintiffs") bring claims against their former employer, Defendant Integra Telecom Holdings, Inc. ("Defendant" or "Integra"), for negligent misrepresentation, fraudulent inducement, and promissory estoppel. (ECF No. 4.)  Before the Court is Defendant's Motion for Summary Judgment (the "Motion") (ECF No. 23). The Court has considered the Motion, the Response of Plaintiffs (ECF No. 26) and Defendant's Reply (ECF No. 28). Also before the Court is Plaintiffs' Objection (ECF No. 27) to certain evidence submitted by Defendant in support of the Motion. For the reasons set forth below, the Motion is GRANTED.

## I.     LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc*., 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether

the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must construe all facts and reasonable inferences against the moving party, thus favoring the right to a trial. *Quaker State Mini-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995); *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

Fed. R. Civ. P. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. "In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. at 323. A movant that will not bear the burden of persuasion at trial may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmoving party on an essential element of the nonmoving party's claim. *Id.* at 325.

A disputed issue of fact must be "genuine." Fed. R. Civ. P. 56(c), (e). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts. The "nonmoving party must come

forward with "specific facts showing that there is a *genuine issue for trial.*" Fed. R. Civ. P. 56(e)

(emphasis added)." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). **"**Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## II.    BACKGROUND

On June 7, 2012, Plaintiffs filed a Complaint and Jury Demand in the Denver District

Court alleging negligent misrepresentation, fraudulent inducement and promissory estoppel

against Integra and other presumably related entities.  (ECF No. 1-1.)  On July 6, 2012, Integra

removed the case from state court on the basis of diversity. (ECF No. 1.) By Stipulation (ECF

No. 9), the parties agreed to dismissal of all claims against all Defendants other than Integra. By

Order dated July 24, 2012, all claims against these other entities were dismissed, leaving Integra

as the sole Defendant. (ECF No. 11.) On March 1, 2013, Integra moved for summary judgment

on all claims made in the Complaint. (ECF No. 23.)  Plaintiffs then filed two responses (ECF

Nos. 26 and 27), one of which (ECF No. 27) was an objection to a portion of Integra's evidence.

Integra thereafter filed a reply.  (ECF No. 28.)  The relevant facts, viewed in the light most

favorable to the Plaintiffs, are as follows.

### A.    Integra shifts its business focus in the direction of Enterprise Teams.

Integra is a communication and networking services provider based primarily in the

western United States.  In February 2011, Integra's Chief Executive Officer, Dudley Slater, was

replaced by a new CEO, Thomas Casey. (ECF No. 23–1 at ¶ 4.)  In May 2011, Casey promoted

Trent Anderson to Vice President of Sales. (ECF No. 23 at 3 ¶4; ECF No. 26 at 3 ¶4.)  Anderson

and other senior executives at the company created a "company-wide Enterprise sales

organization," for the purpose of expanding Integra's "Enterprise organizations" into additional markets. (*see* ECF No. 23–3.) The focus and emphasis of these teams were to be placed on larger customers. Casey made Kevin Laverty Integra's Regional Vice President of Enterprise Sales for Integra's Central Region, including Colorado and five other states.  Laverty worked under Anderson. (ECF No. 23 at 3 ¶5; *see also* ECF No. 23–4 at 23:5–12.)  Laverty eventually promoted Linda Ater to Director of Sales – Enterprise effective July 31, 2011. (ECF No. 23 at 6 ¶ 23; ECF No. 26 at 5 ¶ 23.)

Integra had successfully implemented an "Enterprise Sales Team" model in other markets, most notably Oregon and California. (ECF No. 23–1 at ¶ 8; ECF No. 26 at 4, ¶ 8.) Anderson designed a plan to introduce Enterprise Teams for larger customers in all of Integra's existing markets—including Colorado—based on the model implemented in Oregon.  (ECF No. 23–4 at 70:19–72:3.)  As part of the implementation of an Enterprise Team in the Denver market, Integra intended to build fiber networks to serve "enterprise-level" clients and transfer, as appropriate, certain existing accounts to new Enterprise Teams.[1]  (ECF No. 23–1 at ¶ 7; ECF No. 23–4 at 64:12–21.)  Based on his experience in Oregon, Anderson set a goal for managers of existing sales units to develop a list, if possible, of approximately 40 existing "enterprise accounts" to assign to each new Enterprise Account Executive in Colorado.  (ECF No. 23–4 at 71:1–11; 72:6–9; *see also* ECF No. 22–2.)  Based on Anderson's experience and Integra's successful implementation of Enterprise Teams elsewhere, Anderson and the sales leadership believed Anderson's goal of 40 accounts was reasonable and ascertainable in the Denver market. (ECF No. 23–1 at 3 ¶¶ 8, 9.)

---

[1] Building "fiber networks" entails purchasing or installing fiber optic cable networks at a physical location, normally inside an office building or separate "data center," and then selling communications and networking services that run through those networks.

Anderson worked with his counterpart in the pre-existing Business Services Group ("BSG"), Vice President Matt Smith, to create a process for re-assigning accounts from Integra's BSG to Integra's Enterprise Teams.  (ECF No. 23–1 at ¶ 11.)  On August 11, 2011, Anderson and Smith jointly issued a memorandum to all sales leadership that "formalize[d] the engagement and process of transitioning" certain accounts from BSG to Enterprise Teams. (ECF No. 22–3.)  On August 15, 2011, Byron Cantrall, Regional Vice President in charge of the Denver BSG team, sent an email explaining that based on customer lists already identified, each Enterprise Account Manager would "be assigned anywhere from 150 to 200 'Prospects' and 20 to 50 'Existing Customers.'" (ECF No. 22–4.)

### B.      Integra hires Plaintiffs Heidi Beck and Lisa Francis.

Before working for Integra, Beck and Francis worked for Level 3 Communications, another telecommunications company. Each was separately hired to work for Integra.

Laverty first spoke with Beck by telephone in late May 2011. In July, 2011, Beck interviewed for the job of Enterprise Account Manager at Integra and met with Laverty and Ater. (ECF No. 23–11 at 165:13–25.)  Beck had been at Level 3 for only a month or so at the time she interviewed with Integra. During the interview, Ater told Beck that Integra was "going to add a [sales] team," that Beck "would have 40 to 50 existing accounts to call into, that it would be low-hanging fruit to start out with," and that  "[Integra was] going to have fiber."  (ECF No. 23–11 at 166:15–167:6.)  Ater told Beck that the accounts to be assigned to her had already been identified. (ECF No. 26 at 8, ¶ 62.) Laverty told Beck "about the number of existing accounts that there were going to be split up 40 to 50 between the reps," and that this would be "a great way to jump start this channel." Laverty also said that this was a "great opportunity."  (*Id.* at

182:22–183:4.) Beck does not doubt that at the time Ater and Laverty made these statements, they believed them to be true. (ECF No. 26 at 5, ¶ 31.)

Beck was offered a position with Integra's Colorado Enterprise Team on July 12, 2011. She resigned her position with Level 3 and began her employment at Integra on August 1, 2011.

Francis was contacted by Ater in August 2011. Ater inquired about any interest Francis might have in joining Integra's Colorado Enterprise Team. Francis interviewed in August 2011. (ECF No. 23–19 at 72:14–23.)  During the interview, Ater told Francis that she "would be getting 40 to 50 existing accounts," that "the majority of the role would entail farming those exiting accounts for more business" as opposed to "hunting" for new accounts, and that "Integra would be putting in fiber lines starting off in data centers." (*Id.*; 73:6–7.)  Ater told Francis that the existing accounts had been identified and that Integra was "ready to divvy them up." (ECF No. 26 at 9, ¶67.) Laverty told Francis "about the 40 to 50 existing customers, how exciting that was, what a great opportunity it was for [Francis] and any salespeople that come on board to be able to work those 40 to 50 accounts that no enterprise level rep had ever worked before, so, therefore, they'd be chock-full of opportunities." (ECF No. 23–19 at 91:5–92:2.)  Thereafter, Francis spoke with Beck who told Francis that "they had not received the 40-50 accounts yet," but that Ater had "shown them a list and that it looked really good and they were supposed to get them any day now." (ECF No. 26 at 6, ¶ 45.) Francis received and accepted a job offer from Integra and began work as part of Integra's Colorado Enterprise Team on September 19, 2011. (ECF No. 23–20.)

Both Beck and Francis were hired as "at will" employees. The offer of employment for each was in writing and provided as follows:

> This offer is not to be construed as a contract of employment for any specific length of time or serve as a guarantee of terms. Your employment with the

> Company is, and always will be, "at will." Further, your employment is for no definite period of time and may be terminated by you or the Company at any time, for any reason.

(ECF Nos. 23-14, 23-20.) Once Plaintiffs began employment with Integra, each received an

employee handbook and acknowledged in a receipt that:

> I understand that no provision of the Employee Handbook implies a contract or guarantee of continuing employment with the Company or employment for any specific length of time. I understand and agree that my employment with the Company is "at will" ….

(ECF Nos. 23-17, 23-18, 23-22.)

**C.    Delays occur in transferring account lists from BSG.**

In August 2011, Ater received lists of "potential existing customers" to be transferred

from the BSG Team to the Enterprise Team in Denver. Ater then began the process of working

with Kelly Forsyth of Integra's BSG to transition specific accounts from BSG to the Enterprise

Team. The process did not go smoothly. BSG had the right to refuse to transfer specific accounts

based on an "existing relationship" exception in the transfer plan. Forsyth relied upon this

exception to refuse to transfer a number of accounts. Laverty also believed that there was a lack

of cooperation above the Ater-Forsyth level, and that Integra Vice Presidents Anderson

(Enterprise) and Smith (BSG) were "battling" over the transfer of existing accounts. Although

delayed, Plaintiffs eventually each received lists of existing accounts from BSG. (ECF No. 26 at

7, ¶ 51-55.) The number of accounts received, however, was considerably fewer than the 40 to

50 accounts discussed during the job interviews. These accounts were not received until

December 2011. And many of them "did not present viable selling opportunities." (*See* ECF No.

26 at 8-10.)

### D.    Integra reverses its business direction.

In October 2011, Integra's CEO Casey, left his position, and was replaced by Kevin

O'Hara.  O'Hara was Integra's third CEO in less than one year.  (ECF No. 23 at 10.)  O'Hara

changed the company's direction from that established by Casey. Responding to the change in

direction, Anderson sought to streamline the sales management structure by laying off regional

vice presidents, including Laverty. (ECF No. 23–1 at ¶ 14.)  To further reduce expenditures

because Integra was "financially hurting," Anderson decided to stop expansion in Colorado.

(ECF No. 23–4 at 140:10–17.) Further, he subsequently decided that Integra would eliminate the

Colorado Enterprise Team. (ECF No. 23–1 at ¶ 15; *see also* ECF No. 23–25.)  Integra proceeded

to lay off the entire Enterprise Team in Colorado—including Plaintiffs as well as their manager,

Ater, on January 11, 2012. (ECF No. 23–1 at ¶¶ 15, 16.)[2]

### E.    Plaintiffs incur damages.

Beck and Francis each asserts that she has incurred damages as a consequence of the

matters asserted in the Complaint. Further, each asserts that the damages consist of economic

damages and emotional distress. In their Response, Plaintiffs rely solely upon Exhibits 26 and 27

to the Motion for identification of their loss and damages. (*See* ECF No. 26 at 10, ¶ 73.)

Exhibit 26 consists of excerpts from Beck's interrogatory responses. There, in response to

a request to describe all monetary and financial damages, Beck stated in pertinent part, as

follows:

> While employed by Defendant, Plaintiff made $63,000/year base salary plus a
> ramp of $4,000 per month for 3 months. After Defendant terminated Plaintiff's
> employment, Plaintiff was unemployed for three weeks, during which time she
> attempted to mitigate her damages by diligently searching for a new and
> equivalent position. On or about February 2, 2012, Plaintiff was offered and
> accepted a new position with CBeyond as Senior Account Executive which paid

---

[2] Plaintiffs neither admitted nor denied this fact in their Response to the Motion. Instead, they simply ignored it. (*See* ECF No. 26 at 8.) The Court deems this fact, which Defendant supported with competent evidence, admitted.

> $10,000 per year less in base salary than her position with Defendant. In addition, the position with CBeyond did not include a ramp, whereas the position with Defendant paid a $12,000 ramp. Thus, Plaintiff took a pay cut of $22,000 from her job with Defendant.
>
> On or about October of 2012, Plaintiff was recruited from LinkedIn for a position as an Account Executive II with TW Telecom. Plaintiff accepted an offer from TW Telecom which pays $55,000 base salary per year and $2,000 ramp for three months. This position pays $14,000 less than Plaintiff's position with Defendant.

(ECF No. 23-26 at 8-9.)

The interrogatories excerpted in Exhibit 26 also requested "the complete factual basis for the allegation that you have suffered 'emotional distress and suffering.'" The only portion of the response contained within Exhibit 26 contains an objection with no factual basis for the allegation by Beck.

Exhibit 27 consists of excerpts from Francis's interrogatory responses. There, in response to a request to describe all monetary and financial damages, Francis stated in pertinent part, as follows:

> While employed by Defendant, Plaintiff made $75,000/year plus a bridge payment of $10,000, plus commission. After Defendant terminated Plaintiffs employment, Plaintiff was unemployed for approximately three months, during which time she attempted to mitigate her damages by diligently searching for an equivalent position. On April 1, 2012 Plaintiff obtained a new position with CBeyond. This position pays $75,000/year plus commission, but does not provide a bridge payment unlike Plaintiff's position with Integra. Therefore, Plaintiff's current compensation is $5,000 less than her compensation with Defendant.

(ECF No. 23-27 at 5-6.)

The interrogatories excerpted in Exhibit 27 also requested "the complete factual basis for the allegation that you have suffered 'emotional distress and suffering.'" The only portion of the response contained within Exhibit 27 contains an objection with no factual basis for the allegation by Francis, other than the following sentence fragment:

Plaintiff has experienced stress, anxiety, depression and sleeplessness as a result of her concerns about finding a new job in an extremely competitive market after the

(ECF No. 23-27 at 6.)

### F.   Additional Facts.

Certain additional facts were presented by Integra regarding matters pertinent to the Motion. These additional facts were set forth in the Declaration of Trent Anderson, Vice President for Sales for Integra. These facts are as follows:

1.   Until 2011, Integra's customers were comprised primarily of small to mid-size businesses.

2.   Mr. Casey wanted to aggressively expand Integra's business and focus on growing the company's revenue. Part of Mr. Casey's vision for the company was to obtain larger customers and focus less on small retail business customers.

3.   The creation of the "company-wide Enterprise sales organization" was consistent with Mr. Casey's focus on revenue growth.

4.   Concerned about Integra's financial condition and the costs of aggressively expanding Integra's services, Mr. O'Hara sought to reduce Integra's capital expenditures and overhead.

Plaintiffs objected to these facts solely on the basis that Anderson did not explain "how he has personal knowledge" regarding these matters.[3] No evidence countering these facts was submitted by Plaintiffs.

---

[3] Plaintiffs also object to certain statements of Laverty made during the course of his deposition. These Laverty statements have no bearing on resolution of the Motion and will not be considered.

### III.     ANALYSIS

Plaintiffs bring three causes of action: negligent misrepresentation, fraudulent inducement, and promissory estoppel. (ECF No. 4.)  Integra has moved for summary judgment contending that Plaintiffs cannot establish a causal connection between any representations and Plaintiffs' damages or detriment. Integra also alleges that Plaintiffs cannot establish intent (as to the fraud claim), reasonable reliance (as to all claims), and inappropriate reliance on promises solely of future performance (as to negligent misrepresentation claim).

#### A.     Plaintiffs' Objection to the Additional Facts.

As a preliminary matter, the Court overrules Plaintiffs' objection to the Additional Facts. The sole basis for objection is that Integra's Vice President of Sales did not explain how he has personal knowledge of Integra's customers, as well as its business plans and directions during 2011 and 2012 under CEOs Casey and O'Hara. The Court finds that these matters can be inferred to be within the knowledge of a national Vice President. *See DIRECTV, Inc. v. Budden*, 420 F. 3d 521, 530 (5th Cir. 2005). In making this determination, the Court also notes that Plaintiffs cherry pick Anderson's declaration, admitting a number of statements as to the business and direction of the company while seeking to prevent consideration of other statements which Plaintiffs consider damaging. Further, any doubt as to the basis for Anderson's knowledge as to the challenged matters is resolved by the Supplemental Declaration of Trent Anderson which this Court accepts as tendered. (ECF No. 28-1.) There, Anderson makes clear that he has worked directly with Integra's CEOs in determining corporate strategy. The Additional Facts will accordingly be considered.

### B.   Plaintiffs have failed to show a proximate cause relationship between any alleged representation and their damages or detriment.

One element of each of Plaintiffs' claims is that a proximate connection or relationship must be shown with respect to the acts of Integra complained of and Plaintiffs' damages or detrimental reliance. *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 549 (D. Conn. 1996) (negligent misrepresentation and fraud); *Johnson v. Cadillac Plastics Grp., Inc.*, 908 F. Supp. 847, 852 (D. Colo. 1995) (promissory estoppel); *Brody v. Bock*, 897 P.2d 769, 775-76 (Colo. 1995) (fraudulent inducement). Integra submits that there is no connection between Plaintiffs' damages and any representations made to them during their job interviews. And Integra has come forward with evidence supporting the contention that the terminations were unrelated to a representation of 40-50 accounts made to two potential employees. To avoid summary judgment, Plaintiffs must come forward with sufficient evidence to create a genuine issue of material fact as to these matters. Plaintiffs have failed to do so.

In describing her damages, each Plaintiff makes clear that her losses are the product of the termination of her employment in January 2012. In no instance does either even attempt to identify earlier damages flowing from reliance on any promises and representations made during her job interview, such as reduced income or commissions while at Integra due to the failure to receive promised accounts. Rather, each points solely to the consequences of eventual loss of employment with Integra and the associated difficulties of finding new employment thereafter.

The termination of Plaintiffs' employment with Integra had nothing to do with the representations made to Plaintiffs—regardless of whether those representations were true or false or, if false, due to negligence or fraud. On this point, the evidence is wholly one-sided. Plaintiffs' position with Integra was terminated for business reasons. Integra was experiencing financial difficulty and its newest CEO decided to reverse the direction of his predecessor and cease

efforts to expand the business. (ECF No. 23-1 at ¶¶ 12-14.) Plaintiffs have admitted the fact that

their Enterprise Team was eliminated because Integra was "financially hurting." (ECF No. 23 at

11, ¶ 60; ECF No. 26 at 8, ¶ 60.) Plaintiffs were not terminated due to their performance, and

Plaintiffs concede the point in their Response. "[I]t is undisputed that Plaintiffs were not

terminated for reasons relating to performance." (ECF No. 26 at 16.) They were terminated

because their positions were eliminated to reduce company expenditures. (ECF No. 23-1 at ¶ 15.)

Again, Plaintiffs' Response to the Motion concedes this. "Plaintiffs were terminated as a result of

a decision to eliminate their positions." (ECF No. 26 at 16.) And Plaintiffs' positions were not

the only ones eliminated. Laverty's position was eliminated. (ECF No. 23-1 at ¶ 14.) Ater's

position was eliminated. The entire Enterprise Team in Colorado was eliminated. (ECF No. 23-1

at ¶ 16.)

      Plaintiffs attempt to avoid the obvious consequences of their inability to connect their

stated damages, losses and detriment to the purported promises made to them during job

interviews in two ways. Neither is convincing, and neither creates a genuine issue of material

fact.

      First, Plaintiffs state in their Response that "it is reasonable to infer that Plaintiffs would

have continued employment with Defendant for a reasonable time had they actually been

assigned the 40-50 accounts promised to them." (ECF No. 26 at 16.) They also claim, without

any attempt to cite to any evidence submitted in connection with the Motion or Response, that

"they were terminated precisely because … there never were 40-50 previously identified

accounts assigned to them to manage." *Id*. In short, the contention is that had Plaintiffs been

given the 40-50 accounts promised them, they would have somehow survived the layoff. There is

not a single piece of evidence in support of this claim. To the contrary, the claim flies in the face

facts Plaintiffs admitted. Plaintiffs' entire unit, from the job of its most junior member to that of its most senior supervisor, was eliminated. The reason was "to reduce expenditures" in times of companywide financial trouble. (ECF No. 23-1 at ¶¶ 15-16; ECF No. 26 at 8.)  Plaintiffs' unsupported claim in their Response that they would not have been terminated had 40-50 accounts been assigned to them does not create a genuine issue of material fact in these circumstances. And it is not a reasonable inference.

Second, Plaintiffs repeatedly state in their Response that the reason they decided to leave Level 3 Communications was because they were promised 40-50 accounts at Integra. (*See* ECF No. 26 at 13-15.) Based on this, Plaintiffs claim that *Berger v. Security Pacific Information Systems*, 795 P.2d 1380 (Colo. App. 1990), supports their entitlement to their stated damages in this case. Plaintiffs also imply that they would not have lost their jobs with Integra had they not accepted work with Integra. Therefore, the argument goes, the lost employment is connected to the misrepresentation as to accounts to be assigned because Plaintiffs would not have worked for Integra but for these representations.

Plaintiffs' reliance on *Berger* is misplaced. *Berger* involved a circumstance where a plaintiff was interviewed for a managerial job and, during the interview, received misinformation as to the stability and security of the company and business unit for which she interviewed (sales manager for a business venture called "Recovery Plus" within a larger company known as SPIS). At the time these representations were made, plaintiff's interviewer, who was a SPIS supervisor ("Mitchell") was specifically aware that the condition of Recovery Plus was "very rough" and that there was "substantial risk that Recovery Plus would be discontinued." *Berger*, 795 P.2d at 1382.  Plaintiff asked during the interview about the company's financial status and was given wholly misleading information suggesting both current and long term stability of SPIS and

Recovery Plus. *Id*., at 1383. Seven weeks after plaintiff accepted the sales manager position, Recovery Plus was discontinued by SPIS. Even then, Mitchell assured plaintiff "that she would always have a place with the company (SPIS)." *Id*. Plaintiff then bought a house, financed by the parent of SPIS. Shortly thereafter, because SPIS was performing poorly, Mitchell was terminated, and plaintiff was terminated six days later. *Id*. The Colorado Court of Appeals upheld a jury verdict for damages (including lost salary following termination) on a theory of fraudulent inducement.

Notwithstanding some superficial similarities, *Berger* is a very different case than that which is before this Court. In *Berger*, had the truth been as represented, Recovery Plus would have been stable and viable, and plaintiff would have continued to have her job. Based on this, the Colorado Court of Appeals upheld a jury verdict awarding plaintiff damages resulting from her termination. Here, however, had the truth (as alleged by Plaintiffs) been as represented, Plaintiffs would have each received 40-50 accounts as part of the Enterprise Team and still lost their jobs when the Team was discontinued for reasons unrelated to the number of accounts transferred from one Integra business unit (BSG) to another (Enterprise) and given to *two* employees. In this case, there is no evidence of a connection between what Plaintiffs were told and the loss of their jobs. Or between the promise of 40-50 accounts and their alleged damages. And in this case, each Plaintiff acknowledged in acceptance of her job offer that employment was entirely "at will" and for "no definite period of time." Were the Court to permit recovery of damages flowing from loss of employment under these circumstances, then at will employment could be circumvented whenever an individual accepted a position because of any unfulfilled promise, such as a promise of a corner office, a parking space, longer coffee breaks other matters

having nothing to do with the reason for job termination. *Berger* does not support such a broad and sweeping proposition.[4]

Plaintiffs' syllogistic argument also fails. Plaintiffs suggest that they would not have taken employment with Integra except for misrepresentations made as to accounts to be assigned, that they would not have been damaged by termination of the Enterprise Team had they not been employed as part of such team, and, therefore that their damages were caused by the misrepresentations. The fallacy lies in the conclusion. The misrepresentations, assuming misrepresentations were made, have no connection to the reason Plaintiffs were terminated. As previously explained, the evidence in this matter taken in the light most favorable to Plaintiffs points only to one conclusion. There is no causal connection or relationship between the alleged misrepresentations and Plaintiffs' termination. And because Plaintiffs have linked their damages only to the consequences of termination (ECF Nos. 23-26 and 23-27), there is no legally sufficient relationship between the alleged misrepresentations and Plaintiffs' damages. In short, the tort did not result in injury or cause damages. *See Vanderbeek v. Vernon Corp.* 50 P.3d 866, 872 (Colo. 2002).

The same analysis applies to Plaintiffs' claim of promissory estoppel. Plaintiffs claim no detrimental reliance in terms of salary or other negative impact on them while employed by Integra. It is the termination of which they complain. But the termination is unrelated to the promise to assign 40-50 accounts to Plaintiffs. And the overall circumstances do not support a notion of "injustice" of an unfulfilled promise in any event. *See Calhoun v. Ball Corp.*, 866 F. Supp. 473, 478 (D. Colo. 1997) (injustice can be avoided only by enforcement of the promise).

---

[4] Plaintiffs also place passing reliance on *Pickell v. Arizona Components Co.*, 931 P.2d 1184 (Colo. 1997). There, unlike here, the representations which induced a job change were found to have included representations of a job for "a definite length of time." This was sufficient to overcome the otherwise at will nature of the relationship. *Id.* at 1186.

There is no evidence in this case that Laverty or Ater could have predicted that after Plaintiffs were hired, a new CEO would come on board and change Integra's corporate direction. There is no evidence that Plaintiffs were promised employment of any specific term or duration. There is simply a corporate decision unrelated to any representation made to Plaintiffs which resulted in the loss of employment by Plaintiffs, Laverty, Ater and the entire Colorado Enterprise Team.

### C.  Integra's Other Arguments in Support of Summary Judgment

In view of the fact that the Court's resolution of the proximate cause issues are dispositive of this matter, the Court does not reach Integra's other arguments asserted in support of the Motion.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED; it is therefore ORDERED:

(1)  That Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED;

(2)  That Defendant is awarded costs and shall, within 14 days of the date of this Order, file a bill of costs in accordance with the procedures under Fed. R. Civ. P. 54(d)(1) and D.C. Colo. L. Civ. R. 54.1, which shall be taxed by the Clerk of the Court; and

(3)  That the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiffs.

DATED this 24th day of April, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge